*Dameron Smallwood v. State of Maryland*, No. 22, September Term, 2016. Opinion by Hotten, J.

**CRIMINAL LAW — POSTCONVICTION RELIEF — PETITION FOR WRIT OF ACTUAL INNOCENCE — ACTUAL INNOCENCE**

Court of Appeals held that under plain meaning of Md. Code, Criminal Procedure Article §8-301, a petitioner must be "actually innocent," meaning the petitioner did not commit the underlying crime for which he or she was convicted.

**CRIMINAL LAW — NOT CRIMINALLY RESPONSIBLE— INNOCENCE**

Court of Appeals held that a petitioner who alleges "newly discovered evidence" that he should have been deemed not criminally responsible at his 1985 proceeding, cannot bring a claim under Md. Code, Criminal Procedure Article §8-301 because even if petitioner is deemed not criminally responsible, he is still guilty of the underlying crime, and therefore, not "actually innocent" as required by the statute.

Circuit Court for Baltimore County
Case No. 03-K-843997
Argued: November 7, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 22

September Term, 2016

_____

DAMERON SMALLWOOD

v.

STATE OF MARYLAND

_____

Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,
Harrell, Jr., Glenn T.
        (Senior Judge, Specially
        Assigned)

JJ.

_____

Opinion by Hotten, J.

_____

Filed:   January 23, 2017

We consider whether a petition filed under §8-301 of the Criminal Procedure Article ("Crim. Proc.") of the Maryland Code, provides relief to a Petitioner who alleges "newly discovered evidence" that he was erroneously deemed criminally responsible during his 1985 reverse waiver hearing, when he should have been deemed not criminally responsible ("NCR").

On October 22, 1984, then fifteen-year-old Dameron Smallwood ("Petitioner") fatally stabbed Madge K. Gibson ("Ms. Gibson") in her Baltimore County apartment. Petitioner was charged as an adult, but sought to be tried as a juvenile. At a reverse waiver hearing,[1] held February 6-7, and March 8, 1985, several psychiatric experts testified

---

[1] Crim. Proc. §4-202 (previously Ann. Code 1957, Art. 27, § 594A) governs the process for a juvenile defendant seeking a reverse waiver of a criminal proceeding brought in the circuit court, back to juvenile court. The statute states in relevant part:

(b) Except as provided in subsection (c) of this section, a court exercising criminal jurisdiction in a case involving a child may transfer the case to the juvenile court before trial or before a plea is entered under Maryland Rule 4-242 if:
    (1) the accused child was at least 14 but not 18 years of age when the alleged crime was committed;
    (2) the alleged crime is excluded from the jurisdiction of the juvenile court under §3-8A-03(d)(1), (4), or (5) of the Courts Article; and
    (3) the court determines by a preponderance of the evidence that a transfer of its jurisdiction is in the interest of the child or society.

\*     \*     \*

(d) In determining whether to transfer jurisdiction under subsection (b) of this section, the court shall consider:
    (1) the age of the child;
    (2) the mental and physical condition of the child;
    (3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children;
    (4) the nature of the alleged crime; and
    (5) the public safety.

regarding Petitioner's amenability to treatment and opined that he was not "legally insane" at the time of the crime. The circuit court denied Petitioner's request to transfer the case back to juvenile court. Petitioner was subsequently convicted of first-degree murder and other related charges following a not guilty, agreed statement of facts proceeding, and sentenced to life in prison.

Twenty-six years later, the psychiatrist who originally examined Petitioner concluded her original diagnosis was incorrect. The psychiatrist now opined that Petitioner should have been deemed NCR at the time of his 1985 proceedings. Petitioner subsequently filed a petition for "writ of actual innocence" under Crim. Proc. §8-301, alleging that this revised expert opinion constituted "newly discovered evidence" that generated a "substantial or significant possibility that the result [of Petitioner's 1985 proceeding] may have been different."

For the reasons that follow, we shall affirm the Circuit Court for Baltimore County's denial of Petitioner's petition for a writ of actual innocence.

## FACTUAL AND PROCEDURAL BACKGROUND

For purposes of our discussion, the events giving rise to our inquiry revolve around three events: (1) the reverse waiver hearing held on February 6, 7 and March 8, 1985; (2) the plea agreement proceeding where Petitioner pled not guilty on an agreed statement of facts held on March 13, 1985; and (3) the motions hearing relative to the petition for writ of actual innocence held on November 2, 2012.

According to Dr. Ellen McDaniel's ("Dr. McDaniel's") original January 24, 1985 psychiatric report, her testimony from Petitioner's 1985 reverse waiver hearing, and her

2

deposition testimony from November 17, 2011, Petitioner grew up in a highly abusive, toxic domestic environment that greatly impacted his mental development. Petitioner's father was an alcoholic, and his mother was "an extremely bizarre, at times explosive woman" who suffered from severe mental illness. As a child, Petitioner was verbally and physically abused by his mother. She once beat Petitioner and his siblings so badly that they required hospitalization. She also threatened "to beat [Petitioner] on the head and watch his brains flow out." By the age of ten, Petitioner had lived in three foster homes, which were also abusive settings, and attended several different schools. Petitioner also spent two years in a residential psychiatric facility for children, before returning to live with his mother. During this time, Petitioner and his brother slept on the floor, and did not have sufficient clothing to wear to school.

In the week prior to Ms. Gibson's death, Petitioner was suspended from school for talking back to a teacher. Petitioner's mother became angry and refused to let him leave the house for several days. She also screamed, nagged, and yelled at him repeatedly throughout the weekend. At one point, she told him "she was going to cut [him] up and put [him] in a bag and throw [him] in the dumpster."

On the morning of October 22, 1984, Petitioner's mother finally let Petitioner leave the house to purchase cat food. While Petitioner was out, he continued to hear her voice, screaming, like a "buzzing in his ear," and began fantasizing.[2] After purchasing the cat

---

[2] Dr. McDaniel included this statement from Petitioner in her report, which discussed his mental state during the morning of the murder. She noted that as a means of dealing with stress and depression, Petitioner spent much of his waking hours in fantasy.

(continued . . .)

food, Petitioner went to his old neighborhood and the apartment building where he had previously lived with his mother. Petitioner knocked on the door of one of the apartments and a woman answered. Petitioner asked if the "man of the house was home," but when the woman's husband came to the door, Petitioner mumbled about being at the wrong house and left.

Petitioner then knocked on Ms. Gibson's door, and announced he had a package to deliver that required Ms. Gibson's signature. When Ms. Gibson opened the door, while on the phone with her daughter, Petitioner stabbed her ten times.[3] Thereafter, Petitioner fled, and was observed disposing of a bloody, brown paper bag, and several articles of clothing disappeared from his person. Ms. Gibson later died from her injuries.

## I. Reverse Waiver Hearing

After Petitioner was indicted for first-degree murder and related offenses, his attorneys petitioned for a reverse waiver hearing to transfer Petitioner's case from adult to juvenile court. During the reverse waiver hearing, held on February 6, 7 and March 8, 1985, Petitioner's attorneys first called Dr. Lawrence Donner ("Dr. Donner"), a psychologist, to testify about his diagnoses of Petitioner. Dr. Donner testified that he

---

(. . . continued)

Petitioner particularly fantasized about Jack the Ripper, and "ridding the world of women." She also noted that Petitioner told her that on the day of the murder he "became absorbed in a fantasy about 'killing people secretly, like Jack the Ripper who kills one by one in the night until the whole town is gone, and then goes to another town.'" She also noted that Petitioner began daydreaming about "'doing what Jack the Ripper did[,]'" and "'get[ing] rid of all the women in the world[]'" because "'women always get the upper hand'" and "'he couldn't stand seeing another woman.'"

[3] Petitioner frequently carried a knife on his person.

4

diagnosed Petitioner with: (1) major depression, recurrent, and (2) an identity disorder. Dr.

Donner defined "identity disorder" as:

> a condition which if not treated develops into a borderline personality, which indicates that an individual who is rather extremely unpredictable, may have explosive rage attacks, has problems about their own identity because they have never had a role model to identify with, have marked changes in their mood have [a] poor notion of who they are.

Dr. Donner also explained that a diagnosis of borderline personality disorder was excluded

as to Petitioner because

> [t]here is a problem with diagnostic impressions, and that is his age. He fits very well a diagnosis of borderline personality, but because of his age one cannot make that diagnosis in view of that diagnosis involves the fact that he suffers from, what I see as major depression, recurrent, that he has been depressed much of his life and that he suffers from an identity disorder.

> *    *    *

> You cannot make the diagnosis of borderline personality until an individual is 18 years of age because they are still malleable, still plastic. But if [Petitioner] had the same features that he has now at 18 years of age there is no question in my mind a diagnosis – I would diagnose him as a borderline personality just by virtue of age.

Dr. Donner also opined that Petitioner did not suffer from a mental disorder that caused

him to be "legally insane," specifically stating that:

> [] I am airing conservatively[.] [I]t's conceivable he was having a psychotic episode, but I am not testifying to that effect. I cannot say that that didn't happen, but I am not testifying that it did. [Petitioner] has difficulty distinguishing at times between reality and fantasy. I am not here to testify that he was psychotic at the time, but I cannot say that he wasn't psychotic.

Dr. Donner concluded that, without treatment, Petitioner had "a good chance of becoming

a borderline personality." Dr. Donner recommended that Petitioner be waived to juvenile

court so he could be admitted into a secure treatment facility.

5

Petitioner's attorneys then called Dr. McDaniel to testify regarding her diagnoses of Petitioner and the January 24, 1985 psychiatric report she authored regarding his mental status. Dr. McDaniel concluded that Petitioner was "definitely suffering from a mental disorder[,]" and "his problems were intimately tied up [with] the crime." Dr. McDaniel also found that Petitioner had been "absorbed" in his "Jack the Ripper fantasy" when he attacked Ms. Gibson, *see supra* n. 2, but noted that Petitioner told her Ms. Gibson's "screams 'made me snap out of it. I realized that what I was doing was wrong.'" Dr. McDaniel also noted several times in her report that Petitioner appeared "depressed" during her interviews with him. Ultimately, Dr. McDaniel concluded in her report that

> [Petitioner] is an emotionally disturbed fifteen year old boy who lives a great portion of his life in fantasies. He has suffered through significant trauma during his childhood; including physical and emotional abuse, constant separations and abandonments by family members, and institutionalization in foster homes and a psychiatric facility. The content of his fantasies partially reflects his rage and feelings of helplessness that have developed over years of repeated severe stress. These fantasies also protect him from feeling despair by endowing him with superpowers which enable him to avoid oppression by adults and win admiration. I do not find him psychotic because he does not demonstrate the thought process disturbance, the paranoid ideation, or the extreme mood swings that are symptoms of psychotic illness. However, [Petitioner's] contact with reality is tenuous and when under stress, he withdraws into his daydreams for comfort and escape.

During the reverse waiver hearing, Dr. McDaniel acknowledged she had difficulty diagnosing Petitioner due to his age because he was "emotionally still in the process of changing," and she "could not pigeonhole him into a diagnosis[.]" On that basis, Dr. McDaniel chose diagnostic categories that were flexible, but not necessarily the most "accurate reflections of what[] [was] going on." Ultimately, Dr. McDaniel diagnosed

6

Petitioner with: (1) atypical conduct disorder of adolescence,[4] and (2) mixed personality disorder with depressive and schizoid features. Dr. McDaniel indicated that she diagnosed Petitioner with a conduct disorder due to his age. She also noted that when she discussed mixed personality disorder with depressive and schizoid features, she was emphasizing her two main findings: (1) that Petitioner was severely depressed, and (2) that Petitioner deals with his conflicts and depression by withdrawing into a fantasy world– the schizoid aspect. Dr. McDaniel further explained that:

> When I talk about a personality disorder I am – what is referred to is a sort of a life-style of difficulty, usually in the area of interpersonal relationships. When I say mixed personality disorder, again, I don't think that [Petitioner] has solidified in that diagnostic category. So it's one of those diagnoses that says he really doesn't belong in any other diagnosis [sic], that it's an open door yet. But basically what I am referring to is a lifelong history of difficulty in relationships with others. In large part this has been because he has not had any stable, consistent, supportive figures with whom to relate. And it has been reflected in other areas, such as his peer group relationships, his difficulty relating to authority figures and his retreat from relationships into his fantasy world. That's what I meant by the personality disorder.

Despite these diagnoses, Dr. McDaniel concluded that Petitioner was not "legally insane" at the time he stabbed Ms. Gibson. Dr. McDaniel also recommended that Petitioner be adjudicated by the juvenile court because he would benefit from treatment in a secure facility rather than in prison.

Dr. James E. Smith, II, a court psychiatrist, also testified, but was not asked about Petitioner's criminal responsibility. Dr. Smith stated that on the one occasion he met with

---

[4] The essential feature of a conduct disorder is "a repetitive and persistent pattern of conduct in which either the basic rights of others or major age-appropriate societal norms or rules are violated." Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 45 (3d. ed. 1980) ("DSM-III").

7

Petitioner, Petitioner was oriented, coherent, and displayed no signs of psychosis. Dr. Smith diagnosed Petitioner with a personality disorder.

The circuit court denied Petitioner's request for a reverse waiver. At no point during the proceeding was the extent of Petitioner's criminal responsibility contested or discussed at length by either party or any of the psychiatric experts who testified.

Thereafter, on March 13, 1985, Petitioner followed the advice of his attorney and entered a plea of not guilty on an agreed statement of facts. On the same day, Petitioner was convicted of first-degree murder and other related offenses, and sentenced to life in prison.

## II.    Dr. McDaniel's Revised Psychiatric Diagnoses

In 2009, Petitioner was represented by a new attorney who requested Dr. McDaniel reconsider her prior opinion that Petitioner was not "legally insane" at the time of the 1985 reverse waiver hearing. Dr. McDaniel reassessed her 1985 opinion, and in 2011 reached the contrary conclusion that Petitioner was NCR when he stabbed Ms. Gibson in 1984. Dr. McDaniel determined that at the time of the offense, Petitioner was actually suffering from: (1) major depressive disorder, severe, with episodes of dissociation, and (2) post-traumatic stress disorder ("PTSD").

Dr. McDaniel attributed her revised opinion to several findings that she argued were not available when she originally evaluated Petitioner. Notably, Dr. McDaniel cited

scientists' better understanding of dissociation,[5] particularly in connection to PTSD. Dr. McDaniel also noted that scientists had learned more about PTSD and how "stress actually changes the anatomical features of the brain[.]" She also found that trauma "changes the brain circuitry[]" and can increase the chance of developing certain disorders, including PTSD. These changes can also cause someone to "misperceive[] current day situations[.]" Dr. McDaniel stated that research on the biological basis for this phenomenon appeared only in the last several years, even though the PTSD diagnosis has existed since before the 1980s. [6]

Dr. McDaniel also contended that the "diagnostic nomenclature" in the DSM had changed. For example, in the 1980s the DSM-III said that "diagnosis of a Personality Disorder should be made only when the characteristic features are typical of the

---

[5] Dr. McDaniel defined dissociation as "the lack of integration of consciousness, memory, perception, [and] behavior." Dr. McDaniel noted in her deposition that someone "within the range of normal dissociation" may:

> [S]tart off for work from [his] driveway at 8 o'clock, and…get to the office at 8:45, and… have no memory of what happened during those 45 minutes. [He doesn't] remember being on the highway,… [or] turning [the] car… [He] might have gone that route a thousand times, but today [he has] no memory of it."

[6] We note that, prior to its modern designation, PTSD was referred to as "shell shock" and recognized as a mental disorder as early as World War I. *See* Dr. Edgar Jones, *Shell Shocked*, 43 MONITOR ON PSYCHOLOGY (June 2012), *available at* http://www.apa.org/monitor/2012/06/shell-shocked.aspx. We also note that PTSD was a formally-recognized diagnosis in 1984-85. *See* DSM-III at 236-39. The record also indicates that Dr. McDaniel was aware PTSD was available as a diagnosis in the 1980s, and it was understood that the stress Petitioner suffered and his state of mind in the days preceding the stabbing supported a diagnosis of PTSD at the time of her initial psychiatric diagnoses.

9

individual's long-term functioning[,]" but the manual observed that "manifestations are generally recognizable by adolescence or earlier and continue throughout most of adult life…." DSM-III at 305. In contrast, the DSM-IV-TR, published in 2000, states that "Personality Disorder categories may be applied to children or adolescents" only in "relatively unusual instances," because "traits of a Personality Disorder that appear in childhood will often not persist unchanged into adult life." Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 687 (4th ed., text rev., 2000). Considering those scientific advances, revisions in the DSM, and her post-hoc professional experience since the 1980s, Dr. McDaniel concluded that her initial diagnosis of an atypical conduct disorder or mixed personality disorder was naïve and incorrect.

Based on her revised diagnoses, Dr. McDaniel further concluded that Petitioner was NCR at the time of the offense because his "major depression with dissociative episodes and PTSD" rendered him unable to conform his behavior to the requirements of law. Dr. McDaniel concluded that during the stabbing of Ms. Gibson, Petitioner had "brok[en] with reality during [his] periods of dissociation," including the day of the offense. Dr. McDaniel acknowledged that Petitioner made decisions and acted deliberately before[7] and after the

---

[7] The facts agreed to in Petitioner's March 13, 1985 plea proceeding reflect that prior to stabbing Ms. Gibson: (1) one of Ms. Gibson's neighbors observed Petitioner walking towards Ms. Gibson's apartment, the neighbor had a brief conversation with him, and then watched him continue to head toward Ms. Gibson's apartment; (2) Petitioner knocked on another witness's door, and when she answered, he asked if the man of the house was home, and when the witness's husband appeared, Petitioner mumbled about being at the wrong house and left; (3) minutes after Petitioner left her apartment, the same witness heard police and ambulance sirens on the way to Ms. Gibson's apartment; and (4) Petitioner knocked on Ms. Gibson's door and told her he had a package to deliver and that she had to sign for it.

crime,[8] but that Petitioner slipped into an "altered state of consciousness[]" at the time he stabbed Ms. Gibson.[9] Dr. McDaniel also indicated that Petitioner's deliberate actions before and after the offense may "look[] like conscious behavior, but we don't know what he [was] doing in his mind;" and his actions could have been a "reflection of this fantasy[,]" *see supra* fn. 2.

---

[8] The facts agreed to in Petitioner's March 13, 1985 plea proceeding also reflect that after he stabbed Ms. Gibson: (1) Petitioner was observed by several witnesses running from the apartment toward the Chartley Shopping Center, "wearing grey shorts, a blue vest-type jacket, tennis shoes and carrying a brown paper bag[;]" (2) Petitioner entered a nearby deli and used the deli's bathroom, leaving the bloody bag outside, but retrieving it after he finished; (3) Petitioner proceeded to a nearby automotive shop and asked for a new bag, but the shop did not have bags, so he left; (4) Petitioner was then observed removing his jacket, placing cans into his vest, and throwing the bag into a nearby yard; (6) Petitioner went to a nearby home and "out of breath and sweating," carrying cat food in his vest, and not wearing a shirt or tennis shoes, asked the couple for a new bag because his had broken; and (7) while in the home, he asked the couple if they knew the back way to his home without having to go on Reisterstown Road. Dr. McDaniel also acknowledged in her deposition that Petitioner was aware of his actions, and was acting deliberately, when he "pick[ed] up the bag, carr[ied] it out of Ms. Gibson's home, [ran] through the field,[went] into a store, wash[ed] his hands, dispos[ed] of the bloody bag, [took] the cat food, [went] to a friend's house, ask[ed] for directions to his house, a back way so he [didn't] have to walk on the roads."

[9] "It's… [a matter of] degree of involvement in the fantasy life, how far into it you go…. I mean, he was in the fantasy when he went to his old neighborhood, but he wasn't lost in the fantasy. And I think by the time he came to Ms. Gibson's house he was lost–he was lost in that fantasy…. [Y]ou know, he consciously starts daydreaming. And he gets into this fantasy world and then he loses who he – he forgets – he's removed from consciousness in a sense other than automatic behavior. Gets in the fantasy world. He dissociates by that time."

11

## III. Petition for Writ of Actual Innocence

On August 29, 2011, Petitioner filed a Petition for Writ of Actual Innocence pursuant to Crim. Proc. §8-301. Petitioner requested the court vacate his conviction and order a new trial because "the discovery of the lack of criminal responsibility…is newly discovered evidence which creates a substantial or significant possibility that the result of [his] prosecution…in 1984-85 may have been different."

On November 2, 2012, the Circuit Court for Baltimore County conducted an evidentiary hearing on the petition. The circuit court received Dr. McDaniel's 2011 deposition testimony discussing the bases for her revised diagnoses.[10] The Court also heard live testimony from the State's expert, clinical psychiatrist Dr. Christiane Tellefsen ("Dr. Tellefsen"), who disputed the psychiatric basis for Dr. McDaniel's revised opinion. Dr. Tellefsen first noted that PTSD was an available diagnosis in 1984 and was included in the DSM III, *see supra* fn. 6, and that it was actually a more common diagnosis in the 1980s then it is now.[11] Dr. Tellefsen testified that Petitioner's history was consistent with a diagnosis of PTSD, and that a key symptom for individuals suffering from PTSD is "avoidance[,]" meaning the individual tends "to withdraw from society or withdraw from situations that are stressful to them."

---

[10] In March 2011, Dr. McDaniel was diagnosed with Stage 4 lung cancer, and passed away in January 2013.

[11] Dr. Tellefsen testified that in the 1990s, "the stressful event part of" a PTSD diagnosis was made more stringent by changing the requirements from merely a "stressful event" to "having a stressful event that would be considered life-threatening to" the individual, making it more difficult to obtain a PTSD diagnosis after Petitioner was originally examined and diagnosed.

Dr. Tellefsen also noted that dissociation is a symptom rather than a diagnosis, and that when a person dissociates "they're often engaged in automatic behavior so they're not engaged in novel behavior[,]" and one of the first things a diagnostician looks at if someone says they dissociated is "what [] the thing [was] that they were doing, was this a novel physical activity for them or a novel activity in general for them. Did it involve automatic behavior, sort of reflexive behavior or not, did it involve intentional behavior or not[?]" Dr. Tellefsen further testified that,

> [i]n rare cases, someone might diagnosis [sic] a teenager with a personality disorder, but you really – you have to be very careful about that because you don't know what development is going to do to them as they get older. They don't know if they're going to grow out of it essentially. And that has always been understood through the, you know, the DSM III, DSM IV, [DSM] IV-TR… that you have to be very careful about doing that. And there are – I think it's written as a caveat in both editions of the manual.

Dr. Tellefsen concluded the facts in the instant case did not support Dr. McDaniel's revised diagnoses for several reasons. First, Dr. McDaniel's diagnosis of dissociation did not make sense because people who dissociate tend to engage in repetitive, rather than novel behavior, and Petitioner did not have a history of violence. Second, there were no indications that Petitioner was dissociating at any other point before or after the offense.[12] Third, Petitioner was not previously diagnosed with dissociation. Dr. Tellefsen also noted that Petitioner was not diagnosed with psychotic behavior, and that individuals who typically satisfy the NCR test have severe mental disorders that cause the individual to lose

---

[12] *See supra* fn. 7, 8. Dr. Tellefsen did acknowledge, however, that a defendant can display intentional conduct before and after an offense and still be found NCR.

touch with reality or become psychotic.[13] Finally, Dr. Tellefsen testified that Dr. McDaniel could not "weave" the PTSD and dissociation diagnoses into Petitioner's activities because the evidence indicated that Petitioner acted deliberately and was able to "curb[] his behavior" at various points before and after the stabbing. [14]

During closing arguments, the circuit court observed that Dr. McDaniel's deposition testimony was "rife with inconsistencies," specifically noting that:

> I didn't understand anything about – Dr. McDaniel's testimony in the deposition, and I read it carefully and [heard] about this notion that there was no such thing as post-traumatic stress disorder back in 1984 and that she didn't have the ability to diagnose that then, which is what I understood her testimony to have been. That is preposterous. Post-traumatic stress disorder plainly existed as a DSM diagnosis back in 1984. I do not know why she couldn't have diagnosed it back in 1984. She can diagnose it in 2011.
>
> This episodic dissociation business, you know, I just – I – that's not a DSM III or IV diagnosis. And I recognize that there's some legitimate debate between the parties as to whether or not the evidence supports a logical conclusion that this could have been some sort of a dissociation episode under the circumstances. But again, I imagine, although I didn't hear this, that there was no reason why that couldn't have been a part of the analysis back in 1984.
>
> And there's this odd business in [Dr. McDaniel's] testimony about the fact that she now believes that you cannot diagnosis [sic] someone under the age of 18 with a personality disorder, but that she was incapable of reaching that conclusion back in 1984. I don't understand that at all.

On February 12, 2013, the circuit court denied the petition. In its memorandum, the circuit court concluded that Petitioner "is ineligible to seek relief under an 'actual

---

[13] Dr. Tellefsen noted that schizophrenia, severe bipolar disorder, manic depression, or severe depression with psychotic features all tend to satisfy the NCR test.

[14] *See supra* fn. 7, 8.

innocence' statute[]'" because "he is maintaining that he is actually guilty, but is not criminally responsible." After reviewing the legislative history of Crim. Proc. §8-301, the circuit court found that,

> the plain language of the statute and its legislative history suggest that its application was meant to be limited to those who are innocent of the crime. Nothing about the legislative history of the provision suggests that it was intended to include a claim made decades after a conviction that a defendant was guilty of a crime, but not criminally responsible for its commission.

The circuit court also observed that,

> [w]hile expert opinion testimony is certainly 'evidence' in the broad sense of the word, the courts must be especially vigilant in assessing the reliability and the credibility of an opinion which comes about more than a quarter century after a final verdict under these circumstances. Generally, it is safe to conclude that an expert's opinion, which changes 26 years after the original opinion is rendered, because the expert "lacked experience" when the original opinion was rendered will never be considered "newly discovered evidence" under any rational standard.

The circuit court concluded that Dr. McDaniel's revised opinion was not "newly discovered evidence," because "[t]here was no change between 1984 and the present in the *facts* of this case. No new or different fact was unearthed or otherwise discovered suggesting that the Petitioner's [proceeding] was unfair in 198[5]." (Emphasis in original).

The circuit court also found that, even if a revised expert's opinion qualified as newly discovered evidence, Dr. McDaniel's revised testimony should be accorded "[virtually no weight]." The circuit court noted that Dr. McDaniel's testimony was "generally replete with psychological double-speak and rationalizations designed to obfuscate." The circuit court also found that "throughout [Dr. McDaniel's] testimony she refused to commit to a concrete timeframe within which the Petitioner was allegedly

15

dissociating, or an explanation as to why this dissociation would have formed an adequate basis for a plea of not criminally responsible." The circuit court concluded,

> Dr. McDaniel failed utterly to convince the undersigned that she could not have made the same diagnosis in 1984 as she made in 2011; or that she could not have reached the same conclusion concerning the lack of criminal responsibility in 1984 as she purported to reach in 2011. She did not persuade the undersigned that the DSM-III contained material mistakes or errors in 1984 that, if changed, would have affected her opinion as to criminal responsibility in 1984. Her 2011 analysis was illogical, and her conclusions were unreliable as a matter of the application of ordinary common sense.

The circuit court also concluded it could not "attribute significant weight to [Dr. McDaniel's] 'new' opinions[]" because she described Petitioner's mental state as "fantasy," "a daydream," and "breaking with reality," but "fail[ed] to commit herself to a logically conclusive window of time within which the Petitioner could be deemed to have been incapable of conforming his behavior to the requirements of the law." The circuit court observed this was in "stark contrast to the cogent analysis by Dr. Tellefsen. While Dr. Tellefsen did not evaluate the Petitioner, and while she did not render an opinion on criminal responsibility, her assessment of Dr. McDaniel's diagnostic framework highlighted its rather clear deficiencies."

## IV. The Court of Special Appeals' Opinion

In a reported opinion, the Court of Special Appeals affirmed the circuit court's denial of the petition. *See Dameron Smallwood v. State of Maryland*, 227 Md. App. 1, 132 A.3d 342 (2016).

The Court concluded that despite the absence of an express requirement in Crim. Proc. §8-301 requiring a petitioner to aver the conviction was based on an offense the

16

petitioner did not commit, judicial precedent established Maryland Rule 4-332, which contains such a requirement, as a judicial interpretation of Crim. Proc. §8-301. *See id.* at 8, 132 A.3d at 345 (citing *Douglas v. State*, 423 Md. 156, 182 n. 14, 31 A.3d 250, 266 n. 14 (2011)). The Court also cited *Douglas* for the proposition that Crim. Proc. §8-301 provides a defendant the "opportunity to seek a new trial based on newly discovered evidence that speaks to his or her actual innocence, as evident from the title of the statute itself." *See* 423 Md. at 176, 31 A.3d at 262.

Additionally, the Court cited *Yonga v. State*, where this Court acknowledged that Crim. Proc. §8-301 "is silent on the issue" of whether a person who entered a guilty plea could be granted a writ of actual innocence, but we ultimately concluded that the writ is not available to attack a conviction entered following a guilty plea. *See* 446 Md. 183, 130 A.3d 486 (2016). We stated:

> [t]he history of the legislation, our implementation through our Rules as well as our understanding of what "actual innocence" means, juxtaposed against what a guilty plea involves, however, inform our conclusion that a person who has pled guilty may not later avail himself or herself of the relief afforded by the Petition for a Writ of Actual Innocence.

*Id.* at 194-95, 130 A.3d at 492.

The Court of Special Appeals concluded that for a petitioner to be eligible to bring a petition for writ of actual innocence under Crim. Proc. §8-301, the petitioner must "expressly deny committing the act that led to the conviction," which Petitioner failed to do in this case.

Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issues presented.

17

**STANDARD OF REVIEW**

Generally, the standard of review when appellate courts consider the legal sufficiency of a petition for writ of actual innocence is *de novo*. *State v. Hunt*, 443 Md. 238, 247, 116 A.3d 477, 482 (2015). Courts reviewing actions taken by a circuit court after a hearing on a petition for writ of actual innocence limit their review, however, to whether the trial court abused its discretion. *Id.* at 248, 116 A.3d at 482 (citing *Douglas*, 423 Md. at 188, 31 A.3d at 269).[15]

**DISCUSSION**

I.     **Petition for Writ of Actual Innocence Requires A Defendant to be Innocent of the Underlying of the Crimes For Which He or She Was Convicted**

In 2009, the General Assembly enacted Crim. Proc. §8-301 as the latest in a string of statutes that sought to create postconviction relief for defendants. *See infra*, I.2.a.*; see also McGhie v. State*, 449 Md. 494, 523-24, 144 A.3d. 144, 769 (2016) (Raker, J., dissenting) (discussing the schematic context in which Crim. Proc. §8-301 was enacted). We are compelled to clarify how broadly Crim. Proc. §8-301 should be applied in the context of a defendant who was deemed criminally responsible, but more recently obtained

---

[15] Petitioner argues that this case should be reviewed *de novo* because the purpose of the abuse of discretion standard is to defer to the circuit court's observations and determinations of credibility, which did not occur at the petition hearing because the hearing judge did not preside over the original hearing, and Dr. McDaniel's testimony was reflected in a deposition. Under well-established rules of appellate review, this Court is not a fact-finder, and we cannot set aside the hearing judge's credibility assessments of Dr. McDaniel's and Dr. Tellefsen's respective testimony. *See Thompson v. State*, 411 Md. 683, n. 8, 985 A.2d 32, 43 n. 8 (2009) ("We do not take up the State's invitation to make factual determinations, as that is not the role of an appellate court."). Thus, the proper standard is abuse of discretion.

a revised psychiatric diagnosis that alleges that he should have been deemed NCR at the time of his original 1985 reverse waiver hearing. The dispute regarding whether Petitioner may bring a successful action under Crim. Proc. §8-301 hinges on what the phrase "actual innocence" means in the context of the statute.

To determine the appropriate scope of Crim. Proc. §8-301, we noted in *Douglas* that,

> [i]n statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

423 Md. at 178, 31 A.3d at 263 (quoting *Evans v. State*, 420 Md. 391, 400, 23 A.3d 223, 228 (2011)).

## 1. Plain Meaning

Crim. Proc. §8-301, titled "Petition for writ of actual innocence", provides:

> **Claims of newly discovered evidence**
> (a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
> > (1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and

(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

## Petition requirements

(b) A petition filed under this section shall:
(1) be in writing;
(2) state in detail the grounds on which the petition is based;
(3) describe the newly discovered evidence;
(4) contain or be accompanied by a request for hearing if a hearing is sought; and
(5) distinguish the newly discovered evidence claimed in the petition from any claims made in prior petitions.

## Notice of filing petition

(c)    (1) A petitioner shall notify the State in writing of the filing of a petition under this section.
(2) The State may file a response to the petition within 90 days after receipt of the notice required under this subsection or within the period of time that the court orders.

## Notice to victim or victim's representative

(d)    (1) Before a hearing is held on a petition filed under this section, the victim or victim's representative shall be notified of the hearing as provided under §11-104 or §11-503 of this article.
(2) A victim or victim's representative has the right to attend a hearing on a petition filed under this section as provided under §11-102 of this article.

## Hearing

(e)    (1) Except as provided in paragraph (2) of this subsection, the court shall hold a hearing on a petition filed under this section if the petition satisfies the requirements of subsection (b) of this section and a hearing was requested.
(2) The court may dismiss a petition without a hearing if the court finds that the petition fails to assert grounds on which relief may be granted.

## Power of court to set aside verdict, resentence, grant a new trial, or correct sentence

(f)    (1) In ruling on a petition filed under this section, the court may set aside the verdict, resentence, grant a new trial, or correct the sentence as the court considers appropriate
(2) The court shall state the reasons for its ruling on the record.

20

**Burden of proof**

(g) A petitioner in a proceeding under this section has the burden of proof.

Analyzing the plain language of Crim. Proc. §8-301, we reiterate that in *Douglas, supra*, we concluded that we "[read] the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Douglas*, 423 Md. at 178, 31 A.3d at 263 (quoting *Evans v. State*, 420 Md. at 400, 23 A.3d at 228). Additionally, "[i]t is 'well settled' that 'the title of an act is relevant to ascertainment of its intent and purpose….'" *Mayor & Council of Rockville v. Rylyns Enters.*, 372 Md. 514, 555, 814 A.2d 469, 493 (2002). We have also held that "[t]he purpose of [the title section] is to inform 'the members of the [General Assembly] and the public of the nature of the proposed legislation.'" *See Mayor & City Council of Baltimore v. State*, 281 Md. 217, 225, 378 A.2d 1326, 1330 (1977) (quoting *City of Bowie v. Cty. Comm'rs*, 258 Md. 454, 467, 267 A.2d 172, 179 (1970)).

The "actual innocence" language reflected in the title of Crim. Proc. §8-301 is not defined or clarified in the body of the statute. We therefore look to the definition of the words themselves to determine the plain meaning. "Actual" is defined as: (1) "existing in act and not merely potentially[;]" (2) "existing in fact or reality[;]" or (3) "not false or apparent." MERRIAM WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/actual (last accessed: December 6, 2016). "Innocence" is defined as "freedom from legal guilt of a particular crime or offense[;]" MERRIAM WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/innocence (last accessed: December 6, 2016); "[t]he state, quality or virtue of being innocent, especially…

21

(b) [g]uiltlessness of a specific legal crime or offense." AMERICAN HERITAGE DICTIONARY ONLINE, https://ahdictionary.com/word/search.html?q=innocence (last accessed: December 6, 2016); or "[t]he absence of guilt; esp., freedom from guilt for a particular offense." BLACK'S LAW DICTIONARY (10th ed. 2014). Black's Law Dictionary also defines "actual innocence" as "[t]he absence of facts that are prerequisites for the sentence given to a defendant." BLACK'S LAW DICTIONARY (10th ed. 2014). Under a plain interpretation of these words, "actual innocence" means a defendant is not guilty of a crime or offense in fact. In other words, "actual innocence" means the defendant did not commit the crime or offense for which he or she was convicted. This interpretation of "actual innocence" is further substantiated by a review of the statutory scheme in which Crim. Proc. §8-301was enacted and the statute's own legislative history.

## 2. Legislative History

The statutory scheme within which Crim. Proc. §8-301 was enacted and the statute's legislative history reinforce our view that Crim. Proc. §8-301 limits relief to convicted defendants who did not commit the crimes for which they were convicted.

### a. Statutory Scheme

Prior to 2001, a convicted person had two avenues for postconviction relief under Maryland law. First, the convicted person could bring a claim under Title 7 of the Criminal Procedure Article, commonly known as the Uniform Postconviction Procedure Act. Md. Code (Repl. Vol. 2013), §§7-101 *et seq.* of the Criminal Procedures Article. Under Crim. Proc. §7-102:

(a) …a convicted person may begin a proceeding…if the person claims that:

> (1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;
> (2) the court lacked jurisdiction to impose the sentence;
> (3) the sentence exceeds the maximum allowed by law; or
> (4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of noram corbis, or other common law statutory remedy.

The relief offered to a convicted defendant under Crim. Proc. §7-102 is limited, however, to constitutional claims. *Id.* This postconviction claim must also be filed within ten years after the sentence is imposed, unless extraordinary cause for filing later can be shown. Crim. Proc. §7-103(b).

Second, a convicted person could bring a claim for postconviction relief under Maryland Rule 4-331. Maryland Rule 4-331 contains three independent avenues of postconviction relief. First, under sub-section (a), "[o]n motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial." Md. Rule 4-331(a). Second, under sub-section (b),

> [t]he court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:
> (A) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;
> (B) in the circuit courts, on motion filed within 90 days after its imposition of sentence. Thereafter, the court has revisory power over the judgment in case of fraud mistake, or irregularity.
>
> *       *       *

Third, under sub-section (c):

> The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
> (1) on motion filed within one year after the later of
> (A) the date the court imposed the sentence, or

23

(B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or belated appeal permitted as postconviction relief.

\* \* \*

In 2001, the General Assembly enacted an alternative postconviction remedy, titled "Petition for DNA testing and preservation of scientific identification evidence[.]" Crim. Proc. §8-201. Under Crim. Proc. §8-201(b),

a person who is convicted of a crime of violence under §14-101 of the Criminal Law Article may file a petition:
(1) for DNA testing of scientific identification evidence[16] that the State possesses that is related to the judgment of conviction; or
(2) for a search by a law enforcement agency of a law enforcement data base or log for the purpose of identifying the source of physical evidence used for DNA testing.

Crim. Proc. §8-201 was enacted to provide postconviction relief solely to convicted persons whose cases involved DNA evidence. *See generally* Crim. Proc. §8-201.

The same year that Crim. Proc. §8-201 was enacted, we amended Maryland Rule 4-331 to provide that, on a motion filed at any time, a defendant could move for a new trial "based on DNA identification testing not subject to the procedures of [Crim. Proc. §8-201] or other generally accepted scientific techniques the results of which, if proved, would

---

[16] "Scientific identification evidence" is defined in the statute as evidence that "(i) is related to an investigation or prosecution that resulted in a judgment of conviction; (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and (iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing." Crim. Proc. §8-201(a)(5). The statute defines "[b]iological evidence" to include "any blood, hair, saliva, semen, epithelial cells, buccal cells or other bodily substances from which genetic marker groupings may be obtained." Crim. Proc. §8-201(a)(2).

24

show that the defendant is innocent of the crime of which the defendant was convicted." Maryland Rule 4-331(c)(2).

Finally, in 2008, the General Assembly amended Crim. Proc. §8-201 to state "a petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence." Crim. Proc. §8-201(c).

This Court subsequently explained that the purpose of Crim. Proc. §8-201 is to provide an avenue of relief for convicted persons who are "actually innocent," meaning the petitioner did not commit the underlying crime for which he or she was convicted. *See Gregg v. State*, 409 Md. 698, 715, 976 A.2d 999, 1009 (2009) (noting that Crim. Proc. §8-201 "provide[s] a remedy for persons convicted of serious crimes for which they are *actually innocent*.") (emphasis added); *Blake v. State*, 395 Md. 213, 219, 909 A.2d 1020, 1023 (2006) ("[Crim. Proc.] Section 8-201 was enacted…in line with a nationwide trend to adopt postconviction DNA testing statutes designed to provide an avenue for *exoneration of the actually innocent*.") (emphasis added); *Thompson v. State*, 395 Md. 240, 252-53, 909 A.2d 1035, 1043 (2006) ("Examination of the legislative history of [Crim. Proc.] §8-201 reveals the General Assembly's concern with *actual innocence*…. '[T]he General Assembly's rejection of a requirement that DNA testing not have been available at the time of trial supports the view that the legislative intent in enacting [Crim. Proc.] §8-201 was to provide a mechanism for *exoneration of the actually innocent*.'") (quoting The Revised Fiscal Note for Senate Bill 694 (2001)) (emphasis added).

25

Both this Court's and the General Assembly's repeated use of the term "actual innocence" in the context of Crim. Proc. §8-201 supports our view that the term "actual innocence" means a petitioner did not commit the underlying crime for which he or she was convicted.

### b. General Assembly's Enactment of Crim. Proc. §8-301

The postconviction statutory scheme clarifies the purpose behind enacting Crim. Proc. §8-301– to address the statutory gap that existed for convicted persons who could not obtain postconviction relief because they obtained newly discovered evidence that was either non-biological, or discovered after the one year limitation in Maryland Rule 4-331. This gap in postconviction relief was referenced repeatedly throughout the General Assembly's passage of Crim. Proc. §8-301. *See* Testimony of Senator Delores G. Kelley on S.B. 486,[17] before the Senate Judicial Proceedings Committee (Feb. 19, 2009) (discussing the existent statutory scheme and noting that "most cases for [newly discovered evidence do] not involve biological evidence, and therefore, [there is] no avenue" for a convicted person to contest his or her conviction); Testimony of Delegate Samuel I. Rosenberg on H.B. 366,[18] before the House Judiciary Committee (Feb. 17, 2009) (noting that "[n]ew evidence of a person's innocence often takes years to develop[,]" and that "Maryland Rule 4-331(c) allows a defendant to present newly discovered evidence of innocence up to one year following sentencing or the issuance of the appellate mandate…

---

[17] S.B. 486 was the Senate version of the bill that became Crim. Proc. §8-301.

[18] H.B. 366 was the House of Delegates version of the bill that became Crim. Proc. §8-301.

[and] [o]nly claims of constitutional violation can be asserted under the Uniform Postconviction Procedure Act."); *see also* Testimony of Assistant Public Defender Suzanne Drouet on S.B. 486, before the Senate Judicial Proceedings Committee (Feb. 19, 2009) ("[T]he postconviction law [in Maryland] has developed over the years in a rather piecemeal fashion and as a result of the fact these statutes, these rules have been developed rather independently of each other. [T]here is a gap in the law. Some defendants who discover evidence relevant to a claim of innocence are essentially locked out of a courtroom. This situation occurs when through no fault of any party[,] critical evidence is simply discovered too late to meet the time limits of Md. Rule 4-331. These defendants have no judicial remedy no matter how meritorious the newly discovered evidence may be."). Senator Kelley, a sponsor of the Senate bill that created Crim. Proc §8-301, also stated in her testimony to the Senate Judicial Proceedings Committee that, "[s]ince the development of new evidence sometimes takes more than a decade to materialize, when the evidence becomes available in the case of a wrongfully convicted defendant, there should be available a mechanism for seeking judicial review[,] with the defendant bearing the burden of proof[.]" Testimony of Senator Delores G. Kelley on S.B. 486, before the Senate Judicial Proceedings Committee (Feb. 19, 2009).

The testimony presented to both the Senate Judicial Proceedings Committee and the House Judicial Committee also referenced how the prospective Crim. Proc. §8-301 would allow convicted persons to use the statute to assert their "innocence." *See* Testimony of Delegate Samuel I. Rosenberg on H.B. 366, before the House Judiciary Committee (Feb. 17, 2009) ("HB 366 would make certain that convicted persons who discover new evidence

27

supporting their *innocence* can present that evidence in a court of law.") (emphasis added); Testimony of Executive Director of the Mid-Atlantic Innocence Project Shawn Armbrust on H.B. 366, before the House Judicial Committee (Feb. 17, 2009) ("[HB 366] would create a remedy for *innocent* prisoners who currently have no legal mechanism *to prove their innocence* in Maryland courts. This bill, if appropriately amended, will result in the *freedom of those innocent men and women* in Maryland who cannot prove their *innocence* through DNA testing.") (emphasis added); State of Maryland Office of the Public Defender, Position on Proposed Legislation: SB 486, submitted to Senate Judicial Proceedings Committee (dated April 1, 2009) ("The bill is designed to close a gap in Maryland's postconviction and new trial procedures that prevent certain defendants from litigating *their claims of innocence* and establishing that they have been wrongly convicted.") (emphasis added).

Additionally, the testimony discussing the types of evidence the statute might address, confirm that the statute was only intended to apply to petitioners alleging newly discovered evidence that would exonerate them. For example, Delegate Rosenberg contemplated relief for convicted persons under the statute when "[s]cientific evidence– once thought to be credible– may be found to be unreliable or completely false after subsequent research and analysis" or "a confession of guilt by a third person" comes to light. *See* Testimony of Delegate Samuel I. Rosenberg on H.B. 366, before the House Judiciary Committee (Feb. 17, 2009). Assistant Public Defender Suzanne Drouet also noted that,

28

Science that was one time considered state of the art, for example, comparative bullet lead analysis, arson investigations, microscopic hair analysis, forensic odontology, which is bite-mark analysis, have discovered that they are in fact not particularly accurate and not particularly reliable. But it can take years or decades in some cases to make that discovery. As a result these defendants are also locked out of the courtroom.

Testimony of Assistant Public Defender Suzanne Drouet on S.B. 486, before the Senate Judicial Proceedings Committee (Feb. 19, 2009). Other stakeholders to the bill also provided categories of evidence that could support a finding of innocence, but were precluded under existing postconviction statutes, including: (1) a confession by another individual to having committed the crime; (2) acknowledgement by an eyewitness or other evidence indicating he was mistaken; (3) acknowledgment by an eyewitness or other evidence indicating that the witness intentionally lied; or (4) evidence casting serious doubt on the reliability of scientific evidence used against the defendant. *See* Memorandum from the Governor's Office of Crime Control and Prevention and the Office of the Public Defender to Chairman B. Frosh and Members of the Senate Judicial Proceedings Committee, at 8-9 (Jan. 15, 2009). In each example, the contemplated "newly discovered evidence" would potentially exonerate the convicted defendant.

Finally, the testimony presented to the General Assembly repeatedly acknowledged that Crim. Proc. §8-301 would only apply to a "narrow subset" of convicted persons. Testimony of Senator Delores G. Kelley on S.B. 486, before the Senate Judicial Proceedings Committee (Feb. 19, 2009) ("Now we are talking about a *very narrow subset of people in this bill*….") (emphasis added); *see also* State of Maryland Office of the Public Defender, Position on Proposed Legislation: SB 486, submitted to Senate Judicial

29

Proceedings Committee (dated April 1, 2009) ("This bill affords an avenue of relief for a *small number of defendants* who otherwise would have no means of litigating their claims of *innocence*.") (emphasis added).

Based on the statutory scheme for postconviction relief under Maryland law, and the legislative history that clarifies the intended purpose of Crim. Proc. §8-301, we agree with the State that "[s]ection 8-301 was designed to enable wrongfully convicted defendants to exonerate themselves using newly discovered non-biological evidence." Only defendants who can allege that they are "actually innocent," meaning they did not commit the crimes for which they are convicted, may bring a petition for relief under Crim. Proc. §8-301.

### 3. Maryland Rule 4-332

Maryland Rule 4-332, adopted by this Court on September 8, 2011, became effective on October 1, 2011. Petitioner filed his petition for a writ of actual innocence on August 11, 2011, two months before Maryland Rule 4-332 went into effect. Although Maryland Rule 4-332 does not govern Petitioner's case, it is pertinent to clarify the relationship between Maryland Rule 4-332 and Crim. Proc. §8-301.

Petitioner argues that Maryland Rule 4-332's requirement that a defendant state "that the conviction sought to be vacated is based on an offense that the petitioner did not commit" overrides the contents of Crim. Proc. §8-301 because the statute does not require such a statement. *See* Maryland Rule 4-332(d)(9). As we held, *supra*, Petitioner's characterization of Crim. Proc. §8-301 is incorrect because the statute does require a

30

petitioner to allege he or she did not commit the crime he or she was convicted of in order to bring a claim under the statute.

Additionally, although Petitioner contends that our rule-making authority is limited to adopting rules concerning practice and procedures, and that our rules may not "abridge, enlarge or modify… substantive rights[,]" *Mercantile-Safe Deposit & Trust Co. v. Slater*, 227 Md. 459, 467, 177 A.2d 520, 524 (1962), we have previously held that Crim. Proc. §8-301 is "both procedural in nature and [] a remedial statute[19]…." *State v. Matthews*, 415 Md. 286, 297, 999 A.2d 1050, 1057 (2010) (citing *Gregg*, 409 Md. at 715, 976 A.2d at 1008-09 (2009)) (internal quotation marks omitted). We also noted in *Matthews*, decided before Maryland Rule 4-332 was implemented, that "[i]t is appropriate to give [petitioner] the benefit of a liberal construction of the petition, particularly in light of the salutary purpose of [Section 8-301], the dearth of case law… concerning what a petition must contain in order to satisfy the strictures of [Section 8-301], and the lack, so far, of rules of procedure to guide the process." 415 Md. at 298, 999 A.2d at 1057 (quoting *Simms v. State*, 409 Md. 722, 732, 976 Md. 1012 (2009)). Thus, our own precedent recognized the need for procedural guidance on how to properly implement Crim. Proc. §8-301, which Maryland Rule 4-332 provides.

---

[19] We have generally held that "remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." *Gregg*, 409 Md. at 715, 976 A.2d at 1008.

31

## II. Even If Petitioner Were Deemed Not Criminally Responsible, Petitioner is Not "Actually Innocent" of the Underlying Crime

Maryland Rule 4-242 governs the entry of a defendant's plea in a criminal matter, and states that "[a] defendant may plead not guilty, guilty, or, with the consent of the court, nolo contendere. *In addition to any of these pleas*, the defendant may enter a plea of not criminally responsible by reason of insanity." Md. Rule 4-242(a) (emphasis added). Crim. Proc. §3-109 governs criminal responsibility for criminal conduct. Under §3-109:

(a) A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:
  (1) appreciate the criminality of that conduct; or
  (2) conform that conduct to the requirements of law.

In *Langworthy v. State*, this Court considered the legal effect when a defendant, who pled not guilty and NCR, was adjudicated guilty, but found NCR. 284 Md. 588, 594, 399 A.2d 578, 581-82 (1979). Of import to this case, we concluded in *Langworthy* the Court of Special Appeals erred by holding that the defendant could not appeal from an "acquittal" because the defendant "was found guilty of rape, and the dismissal of the appeal precluded appellate review of that *conviction*. As we have seen, the existing statutory scheme patently contemplates that there be first a determination of guilt or innocence under the general plea." *Id.* at 598, 399 A.2d at 594 (emphasis added). We also concluded that "the clear legislative intent regarding the successful interposition of a plea of insanity is not that an accused is to be found not guilty of the criminal act it was proved he committed, but that he shall not be punished therefor." *Langworthy*, 284 Md. at 598, 399 A.2d at 584. As we succinctly stated in *Pousey v. State*, "in the clearest possible terms, *Langworthy* disposes

32

of the contention that a criminal defendant cannot be found both guilty and insane." 297 Md. 264, 268, 465 A.2d 475, 478 (1983) (internal footnote omitted); *see also Treece v. State*, 313 Md. 665, 684, 547 A.2d 1054, 1064 (1988) ("The issue presented by a plea of not criminally responsible, however, does not arise until a guilty verdict has been found. The issues of guilt and criminal responsibility are separate.") (internal citations omitted). In *Pousey* we also observed that "a finding of insanity is not tantamount to an absence of *mens rea*, or inconsistent with a general intent to commit a crime[,]" and the determination in that case that the defendant was not criminally responsible for her conduct, "merely relieve[d] her of liability for punishment under the criminal law." *Pousey*, 297 Md. at 269, 465 A.2d at 478.

Even assuming, *arguendo*, that Petitioner was found NCR at the time of his 1985 reverse waiver hearing, relief would not be available under Crim. Proc. §8-301 because a claim of NCR is not tantamount to being "actually innocent," defined *supra*. There is no dispute between the parties that on October 22, 1984, Petitioner knocked on Ms. Gibson's door, told her he had a package she needed to sign for, and when she answered the door he stabbed her ten times causing her death. Regardless of whether Petitioner was "fantasizing" or "dissociating" when he attacked Ms. Gibson, his actions caused her death, and he was adjudicated "guilty" of murdering her. *Langworthy* and its progeny establish the separation of the guilt phase and criminal responsibility phase when a defendant pleads NCR. Just because evidence exists suggesting Petitioner could have been found NCR at the time of his 1985 proceeding does not alter the fact that he was still "guilty" of killing Ms. Gibson, and his original conviction would therefore not be vacated.

**CONCLUSION**

In summary, this Court concludes that Crim. Proc. §8-301 requires a petitioner to allege he or she is "actually innocent," meaning he or she did not commit the crime, to petition for relief under the statute. Even if Petitioner was found NCR at the time of the 1985 proceeding, he was still guilty of killing Ms. Gibson, and therefore, was not "actually innocent" of the crime for which he was convicted. Accordingly, Petitioner's claim under Crim. Proc. §8-301 fails.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**